24 Mass. App. Ct. 601                                     601

Technical Facilities of America, Inc. *v.* Ryerson & Son, Inc.; Gilchrist Mfg. Co.

TECHNICAL FACILITIES OF AMERICA, INC. *vs*. JOSEPH T. RYERSON & SON, INC.; GILCHRIST METAL MANUFACTURING CO., INC., third-party defendant.

Suffolk.    December 8, 1986. — August 10, 1987.

Present: GRANT, CUTTER, & PERRETTA, JJ.

*Practice, Civil,* Verdict, Special questions to jury.

At the trial of warranty and negligence claims arising from the failure of a weld in a roof structure, the jury's answers to two special questions were supported by the evidence and were not inconsistent. [605-607]

CIVIL ACTION commenced in the Superior Court on December 9, 1977.

The case was tried before *Francis J. Quirico,* J.

*Lawrence G. Green* for the plaintiff.

*Charles L. Janes* for Joseph T. Ryerson & Son, Inc.

*Russell F. Conn* for Gilchrist Metal Manufacturing Co., Inc.

PERRETTA, J. On May 24, 1977, there was a partial collapse of a portable roof-like structure which was used to provide support for overhead lighting equipment at concerts given by rock music groups. The structure was made of aluminum trusses which were bolted together to form the grid-like rectangle. The collapse was caused when a weld connecting one of the trusses to an end plate failed. The structure was owned by the plaintiff, Technical Facilities of America, Inc. (TFA). TFA had supplied the raw materials for the fabrication and manufacturing of the various components of the structure to the defendant Joseph T. Ryerson & Son, Inc. (Ryerson). Pursuant to its agreement with TFA, Ryerson then "located" the third-party defendant Gilchrist Metal Manufacturing Co., Inc. (Gilchrist), to do the fabrication work.[1] At trial, the main issue was whether

[1] Ryerson's business is primarily the selling of raw steel and aluminum products from stock. However, Ryerson would sometimes engage vendors to fabricate finished metal products for its customers.

TFA or Gilchrist had made the weld that failed. In response
to special questions, the jury found that Gilchrist had built the
structure but that it had not made the weld. Judgment entered
in favor of Ryerson and Gilchrist. On appeal, TFA raises
numerous issues, all of which turn on whether the jury's an-
swers to the special questions were consistent. We affirm.

I. *The Structure.*

There was evidence to show the following facts. TFA was
in the business of providing lighting equipment for use at rock
music concerts. In 1976, it designed and manufactured an
aluminum roof structure made of various trusses. The trusses
were bolted together to form a grid-like rectangle sixty feet in
width (across a stage) and forty-five feet in length (or depth).
Because the trusses were bolted together, the structure could
be assembled and disassembled at the concert site by TFA
employees and transported either to the next concert site or to
TFA's warehouse.

When the demand for its services increased, TFA decided
that it needed two more roof structures as well as three extension
kits so that each of the three structures could be expanded to
a rectangle measuring sixty feet by sixty feet. Additionally,
TFA wanted the parts of each of the three roof structures to
be interchangeable, that is, that the trusses of any one roof
structure could be interchanged with their counterparts in any
of the other roof structures. The components of the extension
kits were also to be interchangeable but only as to extension
kits, that is, the parts of the roof structures could not be inter-
changed with the parts of the extension kits.

In late May of 1976, TFA and Ryerson agreed that TFA
would furnish to Ryerson drawings and raw materials for the
fabrication and manufacturing of the two additional roof struc-
tures and three extension kits and that Ryerson would locate
someone to do the actual work. Ryerson thereafter entered into
its subcontract with Gilchrist.

Some time between June 5th and June 7th, TFA asked Ryerson
whether one of the two ordered roof structures could be delivered
to it in early June. After conferring with Gilchrist, Ryerson in-
formed TFA that such an early delivery was impossible. TFA

next inquired whether one of the three extension kits could be delivered to it so that it could expand its own roof structure of forty-five feet by sixty feet to the needed sixty by sixty rectangle. Ryerson and Gilchrist agreed to that delivery.

On June 9, 1976, TFA received numerous fabricated parts from Gilchrist. The nature and purpose of the parts delivered on that date were sharply disputed at trial for the following reason. As earlier noted, the parts of each of the roof structures and the parts of each of the extension kits could be interchanged. Consequently, no one could state with any certainty which of the three roof structures or three extension kits was involved in the 1977 collapse. However, it was known: (1) that the weld that failed had been made on an extension kit truss; and (2) that Gilchrist had fabricated the pieces for the three extension kits.

TFA offered evidence to show that each extension kit required two 4B trusses for a total order of six such trusses for the three extension kits. The June 9th bill of lading indicated that the pieces delivered to TFA were pieces for 4A2 trusses. As no 4B truss components were delivered to TFA on that date, TFA could not have made the weld that failed. As further support for its claim, TFA pointed to bills of lading dated June 22nd and 25th, each indicating a delivery of three 4B trusses.

Ryerson's contention was as follows. The June 9th delivery consisted of unwelded fabricated pieces which were to be used to form the 4B and 4C trusses necessary for the needed extension kit. To form the fabricated pieces into the necessary trusses, welds had to be made. Therefore, TFA made the welds on the components of one of the three extension kits. Some of the evidence offered in support of this contention is as follows. A salesman for Ryerson during the time here pertinent (but not at that time of his testimony), Henry Athanasiou, testified that the June 9th bill of lading was wrong. That exhibit shows, it will be recalled, that on June 9th, TFA received components for 4A2 trusses. With the assistance of a diagram, Athanasiou explained why, in his opinion, on June 9th TFA did not need any 4A2 trusses to expand its own roof structure. He testified that on June 9th, TFA received unwelded tubes

and plates (that is, the components) for 4B and 4C trusses for an extension kit and that TFA welded those pieces. He further testified that at least one of the two subsequent bills of lading (June 22nd and June 25th) was also in error. According to his testimony, the bills of lading were simply attempts to account for all the pieces or components, even if not welded, that Gilchrist delivered to TFA on its subcontract with Ryerson.

II. *The Special Questions.*

Fifteen special questions were put to the jury, who were instructed that if their answer to either question one or question two was "no," they were to "report that answer to the court and . . . not continue to the other questions." The first question reads, as relevant: "Was the roof structure extension which was involved in the failure . . . a structure which had been built by Gilchrist?" Answering "yes" to question one, the jury took up the second question: "Was the weld which was involved in the failure . . . a weld which was made by Gilchrist?" Because the jury responded "no" to this question, they proceeded no further and reported to the court, as instructed.

It appears from the transcript of the lobby conference held to discuss the special questions that question one, as originally worded, would have asked whether Gilchrist had built the "roof structure which was involved." Gilchrist and Ryerson objected to the question in that form. Gilchrist argued that the question was impossible to answer (because the pieces of the three roof structures were interchangeable and TFA had built one of the three) and that it was immaterial in view of the posture of the evidence and question two, which "goes to the heart of the identification issue." TFA responded that it would not object to the deletion of question one but that, if put to the jury, the question should be amended to refer to the "roof extension kit."

Ryerson then objected: "Our theory . . . is that TFA *built* one of the three extension kits. If the jury finds that TFA *built* one of those three extension kits, there is absolutely no evidence in the record that they could possibly identify which one of the extension kits was . . . [involved]. Therefore, it's very likely that if the jury finds that TFA did *fabricate* one of those extension kits, [it] would be [at] a total loss to then . . .

tell the court which one was . . . [involved]" (emphasis supplied). Concluding that if it were impossible for the jury to answer the question, they would say so, the judge refused to omit question one, but he did amend it to refer to the "roof structure extension."

III. *The Jury's Answers.*

TFA argues that the jury could not find that Gilchrist had built the "roof structure extension" without finding that it had also made the weld that failed. Cf. *Service Publications, Inc.* v. *Goverman,* 396 Mass. 567, 573 n.8 (1986) ("To constitute inconsistent verdicts, it must be shown that the verdicts are based on inconsistent findings of fact. See *Roundy* v. *Stewart,* 140 Ariz. App. 201, 203 [1984]"). But there is a very reasonable view of the evidence which harmonizes the answers. See *Atlantic & Gulf Stevedores, Inc.* v. *Ellerman Lines, Ltd.,* 369 U.S. 355, 364 (1962), quoted in *McCue* v. *Prudential Ins. Co. of America,* 371 Mass. 659, 664 (1976).

TFA's insistence that the answers are inconsistent is based largely upon its use of the word "fabricated." It contends that the jury "clearly found that Gilchrist fabricated the roof extension kit, thereby rejecting Ryerson's position" that TFA "made the weld in question." By then answering that Gilchrist did not make the weld, the jury "was contradicting itself, endorsing a position in favor of Ryerson which Ryerson itself never endorsed — that TFA made a weld on an extension kit fabricated by Gilchrist."

Our reading of the pertinent portions of the transcript of the trial, the lobby conference on the special questions, and the jury instructions shows that Ryerson and Gilchrist devoted their energies almost exclusively to showing that TFA had made welds and that it could not be found with the requisite degree of certainty whether Gilchrist or TFA had made the weld that failed. Ryerson and Gilchrist did not contend that TFA had built an extension kit in the same sense that in 1976 it had built its roof structure. In the context of Ryerson's and Gilchrist's theory of defense, if not in the context of the entire case, the words "build" and "fabricate" were not synonymous, even though they were occasionally used in that fashion. The

evidence shows that Gilchrist took raw materials from which it *fabricated* parts to be used in *building* the pieces for the roof structures and extension kits which could be *assembled* and *disassembled* at concert sites.

The difference between the words "build" and "fabricate" was not lost on the jury. During their deliberations, they asked: "There is some question on the word 'built.' Is this a completed structure or just fabricated parts?"[2] When considered in light of the further instructions set out in note 2, the jury's answer to question two can properly be taken to mean that the jury found that Gilchrist built the roof extension structure but that TFA made the offending weld.

The jury could have found Athanasiou's testimony to be credible, especially in view of the other evidence that in 1976 TFA had built its own roof structure, that at least as late as May of 1976 TFA still had two welders in its employ and that TFA needed one extension kit as soon as possible so that it could expand the roof structure that it had built. Because Gilchrist had fabricated all the necessary parts for the three extension kits, the jury could (and we think it did) find that Gilchrist had built the "roof structure extension," keeping in mind the

---

[2] In response to the question, the judge answered, in relevant part: ". . . Gilchrist was not engaged to construct a roof or stage or any other type structure in its completed form. This was a contract to fabricate some metal into various units or substructures . . . which were described as trusses, and they were referred to as 4A, 4B, 4C, and various other names and numbers. And then when those various trusses and other units were completed, they were delivered to . . . TFA . . . .

"Then you heard that there was evidence that TFA had assembled some of those or many of those parts into the roof of one size or another. There is no claim that Gilchrist . . . assembled the completed structure [at the site of the collapse or any other concert site].

"So, the word 'structure' may mean units of the completed roof or stage or whatever it is that was involved here. But it does not include the completed assembly of those various parts. There were angle irons; there were various kinds of aluminum bars and tubes and squares and whatnot that went to the Gilchrist factory. There they performed some work on it. They cut it to certain sizes; they drilled holes in certain places; they did some welding; they did other work. But when they got through, they didn't deliver a 60 x 60 or 45 x 60 foot roof. They delivered units which were used for the assembly of roofs of that size, or those sizes."

judge's instructions. On those same instructions and the evidence, the jury also could have found that TFA had made a weld on the components of a 4B truss fabricated by Gilchrist from raw materials and delivered to TFA on June 9th. Because it could not be said with any degree of certainty which of the three extension kits was involved in the collapse, it could not be said that TFA had shown by a preponderance of the evidence that Gilchrist had made the weld that failed. Hence, the jury's answer of "no" to special question two. Each of the answers to the questions is consistent with the other and finds support in the evidence.

IV. *Conclusion.*

TFA makes three additional arguments: (1) it should have been allowed to amend its complaint to add Gilchrist as a party-defendant; (2) it should have been allowed to use as judicial admissions against Ryerson allegations that Ryerson made in its third-party complaint that the structure in question had been "built" by Gilchrist; and (3) its motion for a new trial should have been allowed, as the verdict was against the weight of the evidence. It follows from what we have said that we need not consider those claims.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*